Good morning, your honors. I'm here today not as a duet, but I do have co-counselor and I would like to reserve half of my time for him. Do you have some subject matter areas that you're going to, have you divided up the subject matter areas? Is there something we should concentrate on with you and other things we should say for Mr. Harris? Well, Mr. Harris is primarily going to argue the restraint issues and I'm arguing the issues of citizenship. Appellants here are the Hunter family. They are over 100 adult individuals who have always been members of the Pechanga tribe up until 2006. They were born into the tribe as members and they all descend from an original tribal member of the Pechanga reservation. In fact, their family group received one of the original land allotments of the Pechanga reservation from the U.S. government back in the 1880s. The Hunter family's case differs greatly from that of Santa Clara Pueblo v. Martinez, which the tribal council relies heavily on. In that case, the complainants had never been enrolled members of the tribe. Further, in that case, the Martinez were asking the court to change the tribe's membership requirements and by doing so, it would allow the family to be enrolled into the tribe. Here, the Hunters have always been enrolled members of the tribe and they qualify for membership pursuant to the tribal constitution. Counsel, your clients are very sympathetic in my view. The problem is issues of membership have traditionally been exempt from review by the court. So, what's the best case you have that would allow us, I mean I know we're going to get into the issue of restraint, is that what you're saying? Is that, you know, aside from the habeas line of cases, is there any other authority that you offer? The Poudry case, your honor, discusses the issue of a long-standing tribal member being disenrolled from the tribe and banned. And the court in that case, in the Poudry case, found jurisdiction pursuant to ICRA. Right, because that's banishment. But are you saying that your clients have been banished from the tribe? Well, your honor, the issue of citizenship and banishment are very closely related. But the problem that I have, I guess, you can say they're closely related, but we have two different procedures in this tribe. One is disenrollment and another is if they're going to really banish somebody. And if they were really going to banish somebody, they got a procedure for doing that. This was this disenrollment policy. Well, your honor, I mean, they are not banished. They still live there, right? Some of them do, your honor, yes. And they still have the opportunity to live there. Nobody said you got to get off the reservation. Not yet, but they have been harassed in their comings and goings from the reservation. Is there an easier way to banish them once they've been disenrolled than there would be if they hadn't been disenrolled? In other words, is there less required now to take that next step? Well, there is. You're a thief. You stole my question. Yes, because they're no longer members. So what is the difference between a member and a nonmember? Somebody wants to banish them. Is it easier to banish the nonmember than it is to banish the member? And if so, how? Well, the courts hold that the case... I mean, under the tribal law. Well, under tribal law, in this particular case, the guard at the reservation gate can let people come and go as he chooses. Once the Gifredo and the Hunter family were disenrolled, some of the members who were living on the reservation but no longer members of the tribe were followed. They were asked questions. They had to show ID at the entrance to the gate to get in, and they were treated in a way that members of the tribe were not treated. Could the guard exclude them at his discretion if they were a nonmember, whereas he couldn't if they were a member? That's true, Your Honor. Well, that's not exactly true. There are procedures for doing that, are there not, that the tribe has set up, and the guard has to abide by the procedures? Well, the tribe, that's true, but the guard, Your Honor, does have discretion to allow or disallow a person into the tribe. Well, he has that discretion even with tribe members. As I read the rules, he has a discretion to let people on the reservation that he wants on regardless of who it is. But he isn't a part of the banishing in that instance. The banishing is a totally procedure set up by the tribe, unless I'm wrong. Tell me if I am. Well, no, Your Honor, but because of the fact that this family, the Hunter family, have been members of the tribe forever, ever since the tribe was federally recognized in 1978, the Constitution of the tribe says clearly who can be a member of the tribe, and the Hunter family has always been qualified pursuant to the Constitution of the tribe. There has never been any question. It was only until the current tribal council was elected a few years ago that these disenrollments took place. And in doing so, the tribal council, once elected, are using the ruse of sovereign immunity to shelter their real activity from the court, which was to disenroll large members of the tribe, to silence dissent, and to satisfy their own greed, all in order to gain control of a gambling enterprise. Thus far, they have succeeded. Excuse me. Was there some sort of change in the membership requirements that was used to make this determination? In other words, between 79 and 88, was there like a substantive change in the requirements or the standards of proof or something that were applied? Not done by the tribe, Your Honor. The tribal council, the elected tribal council, saw a fit among themselves to see that the Hunter family were somehow not enrolled members. Like you said, in 1978, when the tribe was first federally recognized, the Hunter family was one of the original members of the tribe back in 1978. It's over 30 years later, and to claim that the tribal council was just correcting the roles, it's something they could have done early on when they received federal recognition, but they did not. But as I understand the procedures, the disenrollment procedure begins when it is found they do not meet the requirements set forth in the application which was approved. I mean, that's the only time the disenrollment begins. And as I understand the facts in this situation, somebody came to them, about five tribes or five different families, and they went through all of that disenrollment, having received the information, as they were supposed to do under the procedure, and they came down and said, this one doesn't meet it. And then they gave this family all of the opportunity under the law to come in and present all the evidence they wanted to to see if they were wrong as per the statute. And as I understand it, you do not even claim that they didn't follow the procedure. You're just claiming that whether they followed it or not, it was wrong. Your Honor, the tribe... Isn't that what you're claiming? I mean, I don't see anything in your briefs that say that what they did in their due process that they set out in disenrollment was wrong. All you say is the result was wrong, and therefore we should get involved on a habeas basis. Judge, we did argue in our briefs that the tribe used regulations that are not in the Constitution that are clear, that everybody can see what requirements are necessary to be a tribal member. The tribal council, in its record of decision, came up with a conclusion that somehow if the person hadn't been removed in the 1880s from one village to another, that they somehow were not Pechanga. But that defies history, and it misrepresents the facts, because in the 1880s when the tribe first received its reservation, Paulina Hunter, the original descendant, wasn't an original tribal member. I don't know whether you're answering my question. Was there any procedure used by the tribe wrongly? Not the facts, because every judge finds different facts. Every judge is entitled to find different facts. But was there any procedure outlined by the disenrollment procedure which was wrong? Did they not follow their procedure? In other words, do you have a due process claim? That's what I'm really talking about. Well, yes, Your Honor. What is it? There is a due process claim. The fact that the tribe, first of all, they weren't allowed to bring attorneys. They weren't allowed to cross-examine people. They weren't allowed to even see some of the claims against them that said they weren't tribal members. And, in fact, when they went before the tribal council, they brought literally hundreds of documents that show that they were original members of the tribe. In fact, the tribe's own anthropologist, who did extensive research, told the tribe itself that this family is indeed one of the original members of the tribe. The tribe decided not to follow their own anthropologist's findings and disenrolled them anyway. Counsel, were you going to allow co-counsel to argue? You only have four minutes left. Yes, I am, Your Honor. Thank you. And then you want to reserve some for rebuttal? On rebuttal, yes. All right. Well, you have about five minutes now, which you can either use now for Mr. Harris, or wait and let somebody talk in rebuttal. Well, I think he wants to let co-counsel talk.  In rebuttal. All right. Good morning. Good morning. I have four minutes, and then I have rebuttal. You have four minutes total, and your rebuttal is at my grace. So you should start talking. Remember, she's the ball. No, I'd like to save it all for rebuttal, if you don't mind. All right. You don't want to say anything about the habeas argument? I'd like to save it all for rebuttal. All right. Well, I think you should take a hint here. All right. We're trying to give you some hint, but if you want to save it all for rebuttal. With regards to the habeas, if we get jurisdiction, which is what this appeal is about, we have no doubt that our summary judgment motion would be granted. Our summary judgment motion is that the tribe violated the Indian Civil Rights Act's provisions for due process. Getting there is the difficulty. But Judge Smith asked whether there was any due process violations. Would a due process violation give us jurisdiction? No. No. That was the question I was waiting for you for. All right. The due process violations do not give us. So what I'd like to do is focus on our key argument, which is all the courts agree that a physical detention is no longer necessary for habeas jurisdiction. The test is a potential severe restriction. Now, what's your best case that says the amount of potential restriction that's required to establish habeas jurisdiction? What's your strongest case? Hensley, Jones. The recent case of Rumsfeld v. Padilla says that physical custody is no longer necessary. Well, we know that physical custody isn't necessary, but what degree of restraint is necessary? Oh, what degree of? A 14-hour alcohol treatment program. Yes. Is that the lowest? Nine Circuit case of Dow v. Circuit Court says that attendance requiring a person to attend a alcohol rehabilitation program for mere 14 hours is a significant restraint. Okay. So would you, in the context of the facts of this case, what's the restraint? All right. Can you give me 90 seconds and I can attempt an analogy? All right. The test is a potential severe restraint. Potential means, in the dictionary, a possible, not actual. It may occur. It may not occur. This is the key. The analogy is, if a person is given a suspended sentence, court probation, no conditions of probation other than the suspended sentence, that is a potential severe restraint. What is the severe restraint? The potential of jail. Our clients, having been disenrolled, are now in a hostile, antagonistic position vis-à-vis the tribal officials. The potential severe restraint is banishment. It may occur. It may not occur. The fact that the defendant, who has a suspended sentence, may never have that suspended sentence enforced is not the test. The fact that the banishment may not be. In that instance, there are specific procedures that are set up, and if he violates any of those, then, you know, the sentence is, the suspended sentence is activated. So what's the parallel in this case? What would evoke a banishment here? All right. In the suspended sentence, he may never be suspended. In 40 years of practice, I've had many clients who violate probation, and the suspended sentence is never enforced. There is a procedure you know ahead of time. If you do this, this, this, you're subject to suspension. You're subject. So give us the parallel there. Give us the parallel to this situation. You know, what are the parameters that we know that banishment may be triggered? All right. Well, Michael Giuffreda, who has a, in the record is his declaration, says he's been harassed by the tribal ranger. Correct? The tribal ranger can, at his own unfettered discretion, exclude a person for seven days. Now, if under Dow v. Circuit Court, you can have a significant restraint for not showing up for 14 hours, then being excluded for seven days is a significant restraint. But that hasn't happened. No, but that's the question. That goes to speculation. The judge in the lower court said, well, first of all, he made a mistake saying you needed a physical restraint. We all agree you don't need a physical restraint. You need a potential severe restraint. But you need some procedure, some regulation, something. Yes, all right. But the tribal laws, which we cite at our brief on page 22 of our opening brief and page 5 of our reply brief, have at least four or five procedures which allows the tribe to kick a person out, allows the tribal council, the respondents, not the tribe, to banish a person without notice for any reason. These people are now non-members of the tribe. They are in a hostile relationship to the tribe. That's the reality of this. And if they were members, they couldn't be banished without notice and for no reason? Exactly. They'd have to have a whole tribal meeting. What part of the banishment procedure suggests that answer? Where is that in the record? The difference between the treatment of members and non-members? Okay, I see what you're saying. There is nothing in the record. Well, there's the fact that Michael D'Effredo has been harassed, that he cannot come and go as he please. Hensley says one of the tests of a severe restraint is whether you can come and go as you please. He no longer can come and go as he please. It's uncontradicted that he cannot go to the graveyard. That's a geographical restraint. Our clients in the record cannot go to the elementary school. They cannot go to the senior citizen center. They cannot go to the health center. Those are loss of services, but logically they are also geographical restraints, correct? So what we're really arguing to the court is that you have the severe loss of citizenship, which none of the cases, Kudry, Cuellar, and the denationalization cases, do not separate. Do not separate disenrollment, taking away of citizenship from banishment. They talk about them together. Maybe they didn't write the case real well, but they talk about them as a joint thing, sometimes like the O'Leary case. It says that taking away of citizenship is a severe restraint. All right, counsel, you've exceeded your time by two minutes. We'll give you a minute or two for rebuttal. May it please the court. John Schumacher for the respondent. The issue before the court today is whether Congress in the Indian Civil Rights Act created a remedy through habeas corpus to resolve civil disenrollment proceedings. The petitioners have admitted that the disenrollment procedure was civil in nature. Congress, when it enacted the Indian Civil Rights Act, looked at two different sorts of remedies. They looked at remedies for criminal matters, and they looked at remedies for civil matters. In the criminal area, they originally looked at de novo review before the district courts. After there was objection to that, they looked at alternative remedies and said, okay, in the criminal area, we will do habeas corpus. Then they separately looked at issues with respect to the civil area. Why do you say that habeas corpus is limited to the criminal area? Are there not habeas corpus cases that address detention for civil reasons, such as civil commitments? Yes, there are, Your Honor. When Congress, in looking and enacting legislation specifically with respect to Indian tribes and applying some but not all of the restraints that are in the U.S. Constitution, tailored their statutes specifically to tribes and taking into consideration the sovereign nature of tribes. So they didn't import wholesale the constitutional requirements for habeas corpus or those for due process or the right to counsel, et cetera. So they tailored it, and they looked separately at what remedies should occur in the criminal context when someone was incarcerated as part of a criminal proceeding, and they separately looked at remedies. Well, this is what I'm trying to get at. Because you argue in your brief that I think, or maybe one of the cases does, that one of the requirements for relief under the habeas provision of the Indian Civil Rights Act is that the underlying proceeding be criminal in nature rather than civil. And I'm not seeing that requirement either in the face of the statute or in any binding case law. So I'm wondering whether that's your position, and if so, what would you rely on for that? Your Honor, it does not state that in the statute, and there is no binding case law. There's very little case law on this issue. Because there's nothing in the statute, looking to the legislative history, what did Congress intend when it said that the writ of habeas corpus shall be available to someone who's been detained? Well, another thing we could look for would be analogies to the writ of habeas corpus in other contexts. Is it not the case that there are contexts in which habeas corpus does apply in a non-criminal situation? Yes, Your Honor. There are, Your Honor. And I think another appropriate analogy is the way the United States treats the issue of denationalization. In 8 U.S.C. 1451, there's a whole procedure for if someone has become a nationalized, naturalized citizen. Denaturalization or denationalization? Denaturalization. Someone who was not born into this country. Denaturalized. Okay. And in that situation, like with the Pechanga Ban, if it's determined that they were naturalized on information that was false, there's a procedure for denaturalizing them. There's a separate procedure for potentially deporting that person after the fact. And in situations where you have a deportation that's separate from naturalization, the courts have said that you can't collaterally attack the naturalization decision through the habeas corpus remedy. That's a remedy of appeal. What they're really looking for this court to do is to be, the district courts, to be an appellate body to review the merits of the tribal decision. Counsel, you wouldn't disagree that if these plaintiffs had been banished that there would be jurisdiction under habeas. Would you disagree with that? Your Honor, I think under the case law there is a possibility for that because it would be considered a restraint. I would have to know the specific facts of why that occurred as to whether or not, I would say, in all circumstances. Would you agree that something less than banishment could also trigger habeas jurisdiction? Are you saying that it has to be that severe in order for there to be jurisdiction under the habeas? I think under the case law, banishment is the only thing that's been found to rise to that level. And in the facts in this case, they are not restricted. They're not restricted any more than I am restricted. Every time I go onto the reservation, I have to stop at the guard, even though the guards know who I am, and they check my ID. And if the court were to find that in this situation... They don't let you into the Senior Citizen Center either, I suppose. No, they don't, Your Honor. Or the school. And if the court were to find in this situation the mere fact of disenrollment that wasn't done to punish anyone, it was done according to procedures because the question was raised,  How do you explain the fact that the Tribal Council disregarded the retained anthropologists' considered opinion? They did not disregard the anthropologists. And as you look at the record of decision and the application of the Tribal Council's recommendation where they talk about that, they hired Dr. Johnson to review genealogical records in order to have a more complete record, which the Enrollment Committee is authorized to do under the disenrollment procedures. Now, Dr. Johnson... What was the opinion of the anthropologists? Well, his opinion was that there were possibly four different men who could be the father of Paulina Hunter, and that the evidence with respect to the mother of hers was even less clear. And that's in... Or did he not opine that these plaintiffs were members of the tribe? He did, after the tribe, the Enrollment Committee made its decision looking at the full record, what he provided them with respect to others. All he said in his opinion was, as a preponderance of the evidence, she was a tribal member by virtue of ancestry from two villages. As the record of decision of the tribe makes clear, the Constitution requires that someone be a Tonga Temecula person. So you can't just be from the village of Temecula, which is what Dr. Johnson talked about. Dr. Johnson also says in his opinion that he looked at some of the 1928 enrollment applications, but never discusses the one that the Enrollment Committee relied on, where John Miller, one of Paulina Hunter's descendants, said, yes, she had an allotment at Pechanga, but she was really a member of the San Luis Way. The historical records, there's over several hundred exhibits that the tribes looked at, in addition to what Dr. Johnson provided. They never hired him to substitute his decision for that of the trier of fact, which is the Enrollment Committee. And in his discussion, he talks about a whole lot of assumptions he's making to get to that conclusion. So that was his view, but he was never hired to substitute his view, and it's clear that he never looked at all the hundreds of exhibits that were before the trier of fact. Why do you feel the best analogy is to denaturalization rather than denationalization, given that apparently many of these people were born into the tribe, were born of tribal members and were tribal members when they were born? Wouldn't this be more like denationalization, like TROP? No, the Constitution requires an applicant to provide proof of lineal descent. Unlike with national citizenship, where you're born and you're automatically a citizen, no one is a citizen of the tribe until they apply and provide the necessary proof that they're either of lineal descent for Pechanga Temecula people, or their heir was adopted prior to 1928 under procedures then. And it specifically provides that if you're enrolled in another tribe, so if your parents, let's say you're a lineal descendant of a Pechanga Temecula person, but your parent chose to enroll you at Navajo because you also met their requirements, well, then you can't be a member here. So there is a difference. So your position is you can't be born into the tribe? That's correct. You have to go through a procedure such as you have to go through denationalization in order to become a member of the tribe. How would you compare the detention here with the detention in some of the cases Mr. Harris talked about, 14 hours of alcohol rehab, a suspended sentence, that sort of thing? Well, in the rehab, they were mandated to do something that they didn't have a choice with. Okay, the tribe has not demanded that these people do anything. They're free to come to their homes. They haven't required them to do anything. They've simply determined that they don't need the requirements for eligibility as a member of the tribe, so consequently they don't get the privileges that go along with that. And what about the suspended sentence analogy? Well, in that, if you go with that analogy, under the tribe's exclusion ordinance, anybody who has any dispute with the tribe, whether it's a contract dispute, whether it's an application to be enrolled, could come in and say, I need that reviewed because the tribe may now exclude me because they disagreed with me on the issue that I'm complaining about. Or anybody who goes to their casino and they're unhappy about the way their cards came up could go in and object and say, if you don't review this, they may decide to exclude me. Is it easier to exclude a nonmember than a member? Under the exclusion ordinance, it does not make a distinction. And where is that in the record? Can we read the exclusion ordinance somewhere in the record? Maybe I missed it. Yeah, it's tab number 22, and it simply refers to person. It doesn't make a distinction between member and nonmember as far as who can be excluded. What about the seven-day discretionary exclusion? Well, that is, there's procedure there that the ranger can exclude someone, and then there's a right of appeal that would occur there, and that would apply to anyone. I don't see that there's a distinction in that ordinance. To members as well. Yeah. And tribes do, this tribe does not, but tribes do exclude members. It rarely happens. What about the banishment procedure? Well, the exclusion ordinance is their only procedure for. So that would be what would be used to banish the exclusion procedure. Yes, and the courts have recognized that the tribes have a right to exclude people from the reservation. A permanent exclusion would be the equivalent of a banishment. Yes, Your Honor. Okay. If a person were disenrolled now and excluded later, let's say a year from now, they're excluded for seven days or forever perhaps. Let's just say seven days. At that point, then, would you say that they could file a habeas under ICRA? They might. I think that it would have to be looked at as to why that exclusion was occurring. I guess I can't definitively answer that, but I think under the cases of Hoosier Inquirer, there would be a possibility that habeas would apply in those circumstances. Or would then you come in and say, oh, they can't contest that because that was over a year ago and they didn't exhaust, they didn't contest that at the time, so now it's too late to contest it? No, I think that they can. Well, they have contested it actually. Okay, but let's say if they had, would they then be barred? If they weren't able to contest it now, would they be barred from contesting it later? No, what they would be able to contest at that point is the basis for their exclusion under the exclusion ordinance. Okay? They don't get to collaterally come back and attack the decision to disenroll. Just as someone is denaturalized under 8 U.S.C. 1451 and they're later deported, they do not get to come back and collaterally attack. Well, sometimes they do if there's a violation of due process in the initial proceedings. The only situation where that's happened was where there was a default, so there was nothing that was before the court originally, and the other cases where there was a full review before the district court and full appeal of that denaturalization decision, the court said, no, you cannot come back in and collaterally attack. But we just really don't know what would happen because we're in uncharted waters here. Yeah, but in that parallel, the courts have said where there was a full review and appeal, you don't get to come in and collaterally attack. And I can give the court that side. I understand your argument. Okay. If there are no further questions, Your Honor, we believe that the Congress did not intend ICRA to apply the disenrollment procedures where they're civil in nature and there's no punishment. Well, maybe you lost me on that one. Okay. You're saying then that if the people here now were not allowed to file a habeas against their disenrollment and later were excluded, that they would not then be able to come back and say, oh, by the way, my disenrollment violated my due process and equal protection rights. They wouldn't be able to do that anymore. That's correct. So this would be their only chance to do that. Similar to? And if they weren't allowed to do it now, they would never be allowed to do it. So there would be no remedy if there were, hypothetically, a due process or equal protection violation at this point. There was a remedy. Congress created the remedy. The Supreme Court recognized it in the Santa Clara Pueblo case and said the remedy is within the tribal forum. And they had the opportunity to present their arguments to the Enrollment Committee. They had that reviewed by the Tribal Appellate Council. That's the end of the argument. So it's not that they don't have a remedy. They don't have a remedy that's giving them an answer that they want. But had they been excluded and banished together now, you might concede that that would trigger jurisdiction for habeas. And then they would have been able to attack not only the grounds for their exclusion but also the grounds for their disenrollment. But you're saying that if the tribe separates those two, excludes them now and perhaps banishes them later, then at the later time they would no longer be able to raise their due process and equal protection claims about their banishment. The issue you're raising was addressed in Quare, in Quare 2, where a banishment decision and a decision to disenroll were both made on the same day. And there the court said, well, with respect to a banishment, I can look at those issues, but disenrollment is a separate action. There is, you know, well, there are consequences to that. That's not within the scope of habeas corpus. All right. Thank you, counsel. Rebuttal. Two minutes. The analogy was made because of the potentiality of a suspended sentence. It may occur, it may not occur. Banishment may occur, it may not occur. That's not the test. The test is severity. Poudry specifically says that is what you have to decide. Now, it is Disneyland, it is fantasy to say, as Mr. Schumacher has said, that our hundred clients and hundred children who were disenrolled are in the same position as you and I, and the banishment procedures would be the same for them as it is for you and I. If these people were going to be banished, there was a tremendous controversy in the tribe. There is a threat of banishment hanging over their heads. There is no threat of exclusion hanging over our heads. Here's our argument, and I understand that it has some complications. Our argument is that the severity of taking away citizenship, their heritage and disenfranchisement, one, the existing geographical restraints, which are on the record, and the threat, the potential severe restraint of banishment combined create jurisdiction. In law school, we learn that you expand and contract precedent. Honestly, we are asking the court to expand a significant part of the habeas provision guarantee under ICRA. And I'd like to conclude and then give one minute to Mr. Gilliam. We don't have any minutes to give. We have 18 seconds, counting down. All right. Elizabeth is sitting here. Her heritage has been taken away. Her culture has been taken away by the corrupt, power-grabbing greed, the casino culture, which has degraded and insulted on the Pechanga Reservation traditional Native American values. Their only remedy is for this court to look at the Indian Civil Rights Act, expanding it a small amount under established precedent to give them justice. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for a decision by the court. The next case on calendar for arguing is North County Communications Corporation v. Celco Partnership. We received a note from Call One Cellular and Celco Partnership to divide the time, so we'll put eight minutes on the clock first, and seven minutes, that's for the appellees. Your Honor. All right. Your Honor, for the appellants, we have minutes for our time. I'm just going to reserve 10 minutes for older brother. So you're going to speak for five minutes and then have 10 for older brother? Sorry, reserve five minutes for older brother. All right. All right. Your Honor, Alan Greenberg for Celco, one of the appellees, but I do cede my time to the other two. All right. All right. Thank you. All right. When you're ready, please approach and proceed.
judges: Rawlinson, Smith N. R., Wilken